UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AQUA GROUP LLC,

       Plaintiff,

v.

FEDERAL INSURANCE CO. and WEST
AMERICAN INSURANCE CO.,

       Defendants.

_____/

Case No. 2:08-cv-11766

HONORABLE STEPHEN J. MURPHY, III

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE
TO FILE A SUR-RESPONSE** (docket no. 45) **AND DENYING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** (docket nos. 29 and 39)

**INTRODUCTION**

I.  Facts

      This case involves the plaintiff Aqua Group's claims for insurance benefits for sewer

inspection equipment that was allegedly stolen from it.  Many of the relevant facts are laid

out in the Court's Opinion and Order of March 23d, 2009, docket no. 48, and need not be

repeated here.  In short, in October 2006 Aqua Group LLC ("Aqua") purchased a Ford cube

van that it used for its business of inspecting and repairing sewer lines.  Mere days after

Aqua acquired the van, it was stolen by James Rosencrants.  Rosencrants was an

employee of D'Alessandro Contracting Group LLC ("DCG"), which is closely related to

Aqua: DCG's sole owner, Angelo D'Alessandro, was also a 70% owner of Aqua Group, and

the two companies shared an equipment yard, which was where the stolen van was stored.

      Although Rosencrants admits he did not have permission to take the van, he claims

that he intended to return it after using it to move a mattress he had purchased.  But

Rosencrants did not in fact return the van, which was instead found in Detroit the next day,

having been almost completely incinerated by a fire that apparently started in the cargo area of the van.  Rosencrants claims that the van was actually stolen from him when he stopped to buy cigarettes on his way to pick up the mattress.

It appears that Aqua's insurance claim for the van itself was paid relatively quickly. Its claim for the equipment that was allegedly inside the van, however, has proven more contentious, and is the subject of this litigation.  Aqua is in the business of inspecting and repairing sewer lines.  Much of its inspection is done remotely, by means of cameras that are inserted into the sewer and then send a video signal up to a monitor for observation by Aqua employees.  In order to protect these cameras and to allow them to move around inside sewer lines, before being placed in the sewer they are inserted into devices known as "crawlers," which appear to resemble miniature tractors and can be controlled remotely by Aqua employees.  The record indicates that the van taken by Rosencrants was a mobile sewer-cleaning unit that carried various cameras and crawlers to Aqua's job sites, and that housed a generator and an operating console used to power and control the cameras and crawlers.  Aqua claims that a large amount of such equipment, the total value of which was several times that of the van itself, was on board when Rosencrants took the vehicle, and has never been recovered.

Aqua filed sworn statements in proof of the loss of this equipment under insurance coverages offered by both defendants, West American Insurance Company ("West American") and Federal Insurance Company ("Federal").

II.  Procedural Posture

This action is before the Court for the second time on motions for summary judgment. Previously, Federal moved for summary judgment, arguing that it could not be liable to pay on its policy because Aqua's claim fell within the language of a policy exclusion for

2

dishonest acts by the insured's own employees.  Docket no. 19.  The Court granted this motion in part and denied it in part.  Docket no. 48.  More specifically, the Court concluded that Aqua's insurance policy unambiguously would exclude coverage for any losses that resulted from Rosencrants's dishonest acts, but found that fact questions remain as to whether the claimed loss truly was the "result" of Rosencrants's theft of the van, within the meaning of the policy.  *Id.*

In the first of the two instant motions, the other defendant, West American Insurance Company, argues for nonliability on the grounds of a nearly identical employee-dishonesty exclusion found in its own policy.  Docket no. 29.  West American also argues that under the terms of the policy, Aqua's employee-dishonesty coverage was cancelled as to James Rosencrants, because Aqua and DCG managers were aware of previous dishonest acts that Rosencrants had committed.  *Id.*  In its second motion for summary judgment, West American argues that all coverage under its policy is additionally barred, both by the terms of the policy and by independent rules of Michigan law, because Aqua Group made several misrepresentations in the course of filing its claims.  Docket no. 39.  Federal has joined in this second motion, arguing that coverage under its own policy is barred for the same reason.  Docket no. 44.  Aqua initially objected to this joinder as untimely, docket no. 47, but eventually withdrew this objection, docket no. 50, in return for Federal's agreement not to oppose the filing of a sur-response by Aqua.  Accordingly, the Court will grant Aqua's motion for leave to file that sur-response, and treat Federal as an additional party to those portions of West American's motion that it has joined.

3

**GOVERNING LAW**

I.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

II.  Contract Interpretation

This case involves two insurance policies; that is, two contracts between insurer and insured.  Under Michigan law, the purpose of contract interpretation is to ascertain the intent of the parties. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (Mich.1994).  Whenever possible, the parties' intent is to be discerned from "the language in the contract, giving it its ordinary and plain meaning as such would be apparent to a reader of the instrument." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776,

5

780 (Mich.2003) (citing *Bianchi v. Automobile Club*, 437 Mich. 65, 467 N.W.2d 17, 20 n. 1 (Mich. 1991). The Michigan Supreme Court has explained that a "fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23, 30 (Mich.2005) (citations omitted). Accordingly, "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 628 N.W.2d 491, 494 (Mich. 2001).

Whether a contract's terms are ambiguous is a question of law for the Court to determine. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir.1999). A contract is said to be ambiguous when its words may reasonably be understood in different ways. *Farm Bureau v. Nikkel*, 460 Mich. 558, 596 N.W.2d 915, 919 (Mich.1999). If the Court finds no ambiguity, it should proceed to interpret the contract and may do so at the summary judgment stage. *GenCorp,* 178 F.3d at 818. On the other hand, when a contract is in fact ambiguous, the meaning of its provisions is a question of fact to be decided after trial. *Klapp v. United Ins. Gp. Agency*, 468 Mich. 459, 469 (2003).[1] When dealing with an insurance policy, however, "[i]f an ambiguity exists, the policy must be construed in favor of the insured." *Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 595 (1992). This is equally true of coverage exclusions in an insurance contract, which "are to be strictly construed against the insurer." *Id.* at 597.

---

[1] In the Sixth Circuit, the same rule applies under federal law. *Royal Ins. Co. v. Orient Overseas Container Line Ltd.*, 525 F. 3d 409, 422 (6th Cir. 2008).

**ANALYSIS**

I. Employee-Dishonesty Exclusion: West American Coverage

In regard to the coverage provided by West American, the parties appear to agree that Aqua's policy provides that West American need not pay "for loss or damages caused by or resulting from any of the following: b. Dishonest or criminal act committed by: (1) You, any of your partners, employees . . . .  This exclusion does not apply to . . . acts of destruction by your employees.  But theft by employees is not covered."  Brief in Support of Motion for Summary Judgment, Docket no. 29, pp. 3, 6.

As has already been noted, the Court has previously dealt with a nearly identical argument by the other defendant, Federal, with respect to the employee-dishonesty exclusion in Aqua's Federal policy.  There, the Court noted that by virtue of the "Definitions" section of the policy, the words "you" and "your" referred to any of the named insureds, including both Aqua Group and D'Alessandro Contracting Group.  Opinion and Order of March 23d, 2009, docket no. 48, pp. 16-17.  As a result, the Court concluded that under Federal's policy an exclusion for losses caused by "your" employees would cover losses caused to Aqua by employees of *any* named insured -- including Rosencrants, an undisputed employee of D'Alessandro.  The Court also held, however, that a reasonable jury could believe Rosencrants's story that he intended to return the truck (and whatever equipment was inside) until it was stolen from him in turn -- and that if those were the facts, the policy language was ambiguous as to whether the loss would have "resulted from" Rosencrants's dishonest actions.

It appears that the language of West American's policy may ultimately yield a similar result. The Court is unable to conclude that no fact issue exists on this question, however, for the unfortunate reason that the language relied upon by West American does not

appear in the record.  As adduced in the record, the West American policy consists of a series of many separate "Coverage Forms" and other related documents. Some provisions that appear only in a single form nevertheless seem to apply to the entire policy and are referenced by other coverage forms, but other types of provisions are duplicated, often with significant variations, in many separate coverage forms.  In its brief, West American cites to a "Commercial Articles Coverage Form" as containing the employee-dishonesty exclusion that it quotes, but does not provide a page number or any other indication as to where this provision can be found.  The Court has been unable to locate either a form with this title or an occurrence of the exact language quoted by West American in the exhibits appended to the filings on this motion.

Nor has the Court been able to ascertain which, if any, of the coverage forms that *are* in evidence the quoted exclusion might apply to.  Many of the coverage forms in the record contain their own employee-dishonesty coverage exclusions, which are often similar but never identical to that quoted by West American.  *Cf. id. with* docket no. 29-1, p. 11 (in an "Accounts Receivable Coverage Form") 29-4, pp. 15 (in a "Commercial Fine Arts Coverage Form") 19 (in a "Computer and Telecommunications Equipment Coverage Form"),  25 (in a "Tools and Equipment Coverage Form"), 28 (in a "Sales Sample Coverage Form"), *and* docket no. 29-5, pp. 12 (in a commercial property "Causes of Loss-- Special Form"), 30 (in a "Theft, Disappearance and Destruction Coverage Form"), 32 (in a "Crime General Provisions (Loss Sustained Form)"). Since no briefing on this motion has been directed to the language of these particular employee-dishonesty exclusions, the Court will not grant summary judgment as to the forms of coverage that they apply to.  Since the Commercial Articles Coverage Form that purportedly contains the quoted exclusion is not in evidence

before the Court, the Court is also unable to grant summary judgment as to the exclusion's application to that form of coverage.

## II.  Has Aqua Voided the Policies by Making Misrepresentations?

West American and Federal both argue that Aqua has voided its coverage by making misrepresentations in connection with its insurance claims.  The Commercial Inland Marine Coverage Part of the West American policy provides that it "is void in any case of fraud, intentional concealment, or misrepresentation of a material fact, by you or any other insured, at any time, concerning: . . . . 4. A claim under this coverage part."  Docket no. 29-4, p. 14.  Similarly, Federal's policy provides that "[t]his insurance is void if you or any other insured intentionally conceals or misrepresents any material fact or circumstances relating to this insurance at any time."  Docket no. 44-4, p. 33.

The insurers contend that Aqua Group made three different kinds of misrepresentations, each of which independently would void the coverages.  First, they assert that Aqua filed claims of loss for a number of pieces of sewer-inspection equipment that were not on the van when it was stolen by Rosencrants, and thus were not properly part of the loss.  Second, they argue that regardless of whether the equipment was actually on the van or not, Aqua significantly overstated its value in the proofs of loss.  Third, West American asserts that Aqua inflated its claim for the costs of renting a replacement truck equipment, by filing a claim for five weeks' worth of replacement rentals when in fact it was able to purchase a separate replacement only two weeks into the claimed rental period.

### A.  Governing Law

In Michigan,

The insurer's defense of "false swearing" is an allegation that the insured submitted fraudulent proof of loss.  Fraud or false swearing implies something more than mistake of fact or honest misstatements on the part of the insured.  It may consist of knowingly and intentionally stating upon oath

what is not true, or stating a fact to be true although the declarant does not
know if it is true and has no grounds to believe that it is true.  In order to
prevail, the insurer must prove not only that the swearing was false, but also
that it was done knowingly, wilfully, and with intent to defraud.  Fraud cannot
be established from the mere fact that the loss was less than was claimed in
the preliminary proofs furnished to the insurer.

To void a policy because the insured has wilfully misrepresented a material
fact, an insurer must show that (1) the misrepresentation was material, (2)
that it was false, (3) that the insured knew that it was false at the time it was
made or that it was made recklessly, without any knowledge of its truth, and
(4) that the insured made the material misrepresentation with the intention
that the insurer would act upon it.

*Mina v. Gen'l Star Indem'y Co.*, 218 Mich App. 678, 686 (1996) (citations omitted), *rev'd in
part on other grounds*, 455 Mich. 866 (1997).  This defense of "false swearing" apparently
applies even when not expressly provided for in the parties' contract of insurance.  But
even where, as here, "an insurance policy provides that an insured's concealment,
misrepresentation, fraud, or false swearing voids the policy," in order for such a provision
to apply "the insured must have actually intended to defraud the insurer."  *West v. Farm
Bureau Mutual Ins. Co. of Mich.*, 402 Mich. 67, 69 (1977) (citations omitted).  In the Court's
view, then, an insurer wishing to establish a defense of false swearing under Michigan law
must establish the four *Mina* elements regardless of whether or not the policy provides for
the defense.

In this light, the Court will examine each of the three forms of false swearing that the
insurers claim Aqua engaged in.  Each of the claimed misrepresentations clearly was
material, in the sense that the insurers claim that the true facts would have required them
to pay significantly less than Aqua represented.  There also can be little doubt that Aqua
intended for the insurers to act on the representations, as they were contained in sworn
statements in proof of loss that were presented to the insurers for the very purpose of
securing payment on the policies.  This leaves for consideration the second and third *Mina*

elements: whether Aqua's representations were indeed false, and if so whether Aqua either knew them to be false or had no grounds to believe that they were true.

B.  Claims for Equipment that Was Not Lost?

1.  Facts

The record indicates that the van and the equipment claimed by Aqua were all purchased as a single package from a vendor known as Jack Doheny Supplies ("Doheny"). *See generally* quotations from Jack Doheny Supplies, Inc. and Aries Inds., Inc., and Purchase Order from Aqua Group LLC, docket no. 33-9.  The insurers maintain that Aqua has represented that all the package equipment was stolen along with the van, when in fact much of it was not.  They come to this conclusion by way of two deductive arguments. First,  they maintain that the dollar value of the loss claimed by Aqua is essentially identical to the dollar value of the entire equipment package.  Second, they point to testimony by Aqua employees and others indicating that only a relatively small portion of this equipment was on the truck when Rosencrants took it.  Accordingly, the insurers argue, Aqua knowingly or at least recklessly misrepresented the extent of the loss, and thus voided its coverage.

The quote from Doheny, along with the purchase order submitted by Aqua, indicate that Aqua purchased the following equipment along with the vehicle:  two Aries cameras, a camera control unit, a motorized cable drum, a Badger Crawler and a Mini Badger Crawler, a Lateral Launch, a "mini cam" (which apparently was also known as a "GatorCam"), and a Titan Storm Crawler.  Docket no. 33-9.  The total price for this equipment was listed in the purchase order as $267,540.02, of which $35,143.77 was sales tax.  *Id.*  The subtotal listed for "televising equipment" was $219,396.25.  *Id.*  Listed separately from the "televising equipment" were the prices for the mini cam ($7500), the

Titan Storm Crawler ($13,500), and "Flexidata Software" ($12,000).   As the total of all these items comes to greater than the listed total price of $267,000, it appears that the some of the individually enumerated items must also have been included in the generic category of "televising equipment."

Aqua appears to agree that its claim is for the loss of all of this equipment.  Aqua and its sister entity DCG filed four sworn statements in proof of loss with the insurers, the amounts in each of which seem roughly to correspond with the equipment values listed on the purchase order.  The three initial statements filed with Federal and West American in January of 2007 claim the loss of equipment valued at $229,896.25, which is somewhat below the full value listed on the purchase order.  Docket nos. 46-6 and 46-7.   Doheny subsequently accepted $196,899.50 from Aqua as payment in full for all of the purchased equipment, however, Dep. of Gary Mapes, docket no. 33-8, p. 27; dep. of Douglas Allan-Edward Kamienecki, docket no. 43-6, p. 18, and Aqua's final sworn statement, filed with Federal in March of 2008, correspondingly values the total equipment loss at $196,880, docket no. 46-5.

### a.  The Insurers' Evidence

The insurers point to several pieces of record evidence indicating the falsity of Aqua's claim that all of this equipment was lost along with the van.  First, Rosencrants himself testified that the van did not contain any cameras at all at the time he drove it away.  Dep. of James Jay Rosencrants, docket no. 39-6, p. 40.  He similarly stated that the camera control unit, two Badger Crawlers, the Lateral Launch,[2] the Titan Storm Crawler, and some other pieces of equipment were also gone from the van.  *Id.* at 38-41.   Second, Carlos

---

[2]  It is not entirely clear from the record whether the Lateral Launch was itself a camera, or whether it was some other type of equipment.

Rodriguez, Aqua's senior superintendent, testified that he went into the van the night before it was stolen, took out the mini cam, and placed it in a equipment trailer  Dep. of Ynderso Carlos Rodriguez, docket no. 39-7, pp. 25-27, 29, According to Rodriguez, the mini cam was still in this trailer after the theft occurred.  *Id.* at 33.  Rodriguez further stated that despite having worked around the van, he had "never seen" the lateral launch or the Titan Storm Crawler on board, *id.* at 27, and that only one of the two Aries cameras was on the van on the day before the theft, *id.* at 28.  Rodriguez stated that this equipment was big enough that he would have seen it that night, if it had been in the back of the van.  *Id.* at 30.  Rodriguez did state, however, that he "know[s]" that the two Badger crawlers and one of the Aries cameras were in the van the night before the loss.  *Id.* at 29-30.   He also acknowledged that he had not seen any of the equipment purchased with the van, other than the mini cam, since the day of the loss.  *Id.* at 33.

Third, the insurers have adduced the testimony of Matthew Weippert, an officer of the Royal Oak, Michigan Police Department.  Shortly after Rosencrants drove off with the truck, he was involved in a relatively minor traffic accident, and Officer Weippert was called to the scene.  Dep. of Officer Matthew Weippert, docket no. 39-5, p. 7.  Weippert suspected that drugs might be involved in the incident,  docket no. 36-5, pp. 25-26, and searched the cargo compartment of the van, but found no evidence to corroborate his suspicions,  docket no. 39-5, at 8.   At his deposition, after being shown photographs of sewer inspection cameras and also given verbal descriptions of their appearance, Officer Weippert testified that he had not observed any such objects in the rear of the truck.  *Id.* at 8-10.

Further, Federal and West American point to the report of Herndon and Associates, an investigative firm that apparently was retained by Federal to examine and analyze the burnt-out truck. The Herndon investigators noted that the rear compartment of the van

contained, in relevant part, "what appears to be the remains of a computer," docket no. 30-6, p. 2, as well as "a piece of machinery/cord feeder, an Onan generator, computer equipment, an empty tool box and a few loose hand tools," *id.* at 7. "Located in the cab area was an owner's manual for a Badger Wheel Camera Transporter." *Id.* While the Herndon investigators did not explicitly note the absence of any remains of cameras, crawlers, or other equipment, neither did not note their presence.

To reinforce this point, the insurers have adduced the testimony of Nathan Robinson, who was an employee of Aqua Group at the time of the loss and who had been working on the truck in question the day that it was stolen. Dep. of Nathan Robinson, docket no. 33-10, pp. 6-7/ When shown photographs of the burnt-out truck, Robinson stated that he was unable to identify any cameras, crawlers, the lateral launch, or indeed any equipment that was purchased from Doheny along with the truck.[3] Dep. of Nathan Robinson, docket no. 30-7, pp. 52-54.

### b. Aqua's Evidence

In response, Aqua points out several pieces of evidence that tend to contradict the testimony of Rosencrants, Rodriguez, and the others.

Nathan Robinson, an Aqua Group employee who had been working around the van the entire week before it was stolen, specifically recalled that both Aries cameras, the camera control unit, the two Badger crawlers, and the lateral launch were on the truck on

---

[3] Aqua argues that this evidence is not admissible, because Robinson has not been certified as an expert in identifying burnt-out sewer inspection equipment, and the jurors should thus be able to examine the photos for themselves and draw their own conclusions without the interference of his opinion. The Court is inclined to agree with this view, especially since it is not clear that the photos examined by Robinson are in evidence. Since the Court concludes that questions of fact remain as to the presence of the equipment even when Robinson's testimony is considered, there is no need to rule on this evidentiary question now. Should the matter arise again at trial, the Court will revisit it in light of the circumstances that prevail at that time.

the day of the loss.  Dep. of Nathan Robinson, docket no. 33-10, p. 10.   Robinson had no recollection as to the presence of the mini cam or the Titan Storm Crawler in the truck on that day -- those pieces of equipment had not been used on Aqua's job that week, according to Robinson, but neither of them was stored anywhere except in the truck, and "there would be no reason to remove" them because a situation where they would be needed might arise at any time.   *Id.* at 11-14.

Clinton Llewellyn, the 30% owner of Aqua Group and the member in charge of managing its worksites, stated that except for the cameras and crawlers, all of the equipment purchased with the truck was physically attached to the truck, and "bolted down."  Exam. under Oath of Clinton Llewellyn, docket no. 33-13, pp. 13-14, 16-17. According to Llewellyn, even the camera equipment was "always in the van, there's no where else for it to be.  The van is inoperable without it. . . .  They would not leave the yard without it, they would not come back without it, and that's where the equipment was stored. It had its place in the truck."[4]   *Id.* at 12.  Llewellyn also submitted an affidavit in which he swore that the entire equipment package (including, contrary to Rodriguez's testimony, the mini cam) has been missing since the van was taken.[5]  Docket no. 42-4.

Steven Wathen, an Aqua employee and the only person authorized to drive the van, also testified as to its contents.  His testimony reflects a detailed knowledge of what

---

[4]  In referring to the stolen vehicle, Llewellyn apparently used the words "van" and "truck" interchangeably.

[5]  The insurers strenuously argue that this affidavit is inadmissible -- and indeed suggest that Aqua's attorneys should be sanctioned for submitting it -- because Llewellyn had no personal knowledge of what equipment was or was not on the truck when Rosencrants took it. This argument is without merit.  Llewellyn has not sworn that the GatorCam was on the truck at the time of the theft, but simply that it was missing from Aqua's equipment yard after the truck was stolen.  As he was regularly in the yard and in contact with Aqua's equipment, his statement is based on personal knowledge.

equipment belonged on board, and where it was stored.  *E.g.*, dep. of Steven Wathen, docket no. 39-9, pp. 19-20.  Wathen stated that the entire equipment package was on the van the day before the theft, except that he had no specific recollection as to the mini cam and the Titan crawler.  *Id.* at 14-15.  He also stated that the mini cam and the Titan would nevertheless have been needed on that week's job, although not every day, *id.*, but that when not in use they were stored outside the van, in a storage trailer[6] and a garage, respectively, *id.* at 16.

    2.  Analysis

This evidence reveals sometimes striking differences of opinion among Aqua employees and members as to where the company's equipment was stored, when it was used, and whether it was on the van at various times during the week before the theft. Nevertheless, the Court finds that the available evidence divides the equipment into three broad categories.

The first category consists solely of the motorized cable drum.  There was no specific testimony as to its presence in the van at any time; Wathen suggested that the entire equipment package (including the drum) was there the day before the theft, and Llewellyn testified that it, along with other equipment, was bolted into the truck.  Further, when asked to go through the equipment package item by item, Rosencrants notably omitted to indicate that the cable drum was missing from the truck.  Although Robinson stated that he could not identify any of the equipment package (including the drum) from the pictures of the wrecked truck, the Herndon report indicated that a "piece of machinery/cord feeder" was found in the wreckage.  In the Court's view, this evidence creates a question of fact as to

---

    [6] It appears that this is the same storage trailer in which Rodriguez stated that he placed the mini cam the day before the theft.

whether the cable drum was present both at the time of the theft and at the time the truck was destroyed.

The second category of equipment consists of the two Aries cameras, the camera control unit, the two Badger crawlers, and the lateral launch. Aqua has adduced considerable eyewitness testimony that (1) this equipment was regularly kept on the van and (2) it was on the van during the workday both the day of and the day before the theft. Llewellyn stated that all these pieces of equipment were either attached to or regularly stored on the van. Rodriguez recalls one of the Aries cameras, as well as the Badger crawlers, being present the night before the theft. Wathen stated that all these items were present on the van during that work day, and Robinson specifically recalled them being there mere hours before the theft occurred. In contrast, the insurers have adduced eyewitness testimony that (1) some of this equipment was *not* on the van before the theft, and that *none* of it was on board either (2) at the time of the theft or (3) shortly after the theft, and further eyewitness testimony that at the least suggests that it was not in the truck (4) after the time of the fire. Rodriguez states that the lateral launch and the other Aries camera were not on the van the night before it was taken, although he says that they have been missing since the date of the theft. Further, Rosencrants states that these items were not present when he took the van, Weippert did not notice their presence during his inspection, and neither the Herndon investigators nor Robinson noted them in the wreckage.

This evidence creates a question of fact as to whether the items in this category of equipment were on the van during working hours on the day of the theft. The Court further concludes that it also creates factual questions as to their presence in the van both at the time of the theft and at the time of the fire. It is true that Aqua has presented no direct

evidence to contradict the testimony of eyewitnesses such as Rosencrants, Weippert, and the Herndon investigators, all of which favors the insurers.  But with respect to each of these witnesses, there exist special considerations that would permit a reasonable finder of fact to attach less weight to this testimony than it might ordinarily command.

First, Rosencrants has an obvious interest in the question of how much equipment was on the truck -- the more equipment was there, the more serious was his crime -- and his testimony that the truck was essentially empty could thus reasonably be regarded as suspect.  Second, when Officer Weippert inspected the cargo compartment of the truck, he was looking for evidence of some sort of illegal activity.  There is no indication that he was interested in identifying sewer inspection equipment, or even that he knew what it looked like.  Third, by the time the Herndon investigators examined the vehicle, its contents had been severely damaged by fire, to the extent that they noted the presence of "what appears to be the remains of a computer."  Under these circumstances, a reasonable fact finder could decline to treat their failure to note the presence of sewer-cleaning equipment in the truck as conclusive evidence of its absence, especially since the report does not specifically state that the investigators looked for the remains of such equipment and found none, or that they had exhaustively cataloged the contents of the truck.  Finally, the conclusiveness that a reasonable fact finder would be compelled to accord to Herndon's findings is further undermined by the lack of any indication in the record that nothing had been removed from the truck between the time of the fire and the time of the investigation, more than two weeks later.

For this reason, the Court concludes that a reasonable jury could choose not to credit the eyewitness testimony adduced by the insurers as to the absence of the equipment on the van during and after the theft.  If the jury did so, it could further choose the credit the

18

other testimony that this equipment was ordinarily kept on the van, was indeed on the van earlier in the day of the theft, and has been missing since the theft. A jury that credited this testimony could reasonably infer that the equipment must indeed have been on the van, and was lost along with it. Accordingly, a genuine question of fact remains as to this issue, and summary judgment is not appropriate.

The final category of equipment consists of the mini cam and the Titan Storm Crawler. No witness specifically recalls either of these pieces of equipment being present on the truck at any time during the week before its theft. Llewellyn acknowledged that it was possible to remove these items from the truck, but denied that it would have been normal to do so. Wathen did state that this equipment would have been used at the jobsite where the truck had been that week, although not necessarily on the day the truck was taken, and Robinson stated that it would normally have been on the truck despite not having been used at that site. Rodriguez, however, specifically testified that those items were *not* on the truck the evening before the loss. He further stated that he personally removed the mini cam from the truck to a storage trailer that evening, and that it remained there after the theft. Wathen agreed that this trailer would have been the normal storage location for that camera. On the other hand, Rodriguez acknowledged that he had not seen the Titan crawler since the day the truck was lost. Further, Llewellyn maintains in contradiction of Rodriguez that the mini cam has also been missing since the day of the loss. As with the second category of equipment, Rosencrants and Weippert both deny that either the camera or the crawler was present in the truck at the respective times of their observations, the Herndon report contains no record of them, and Robinson was unable to identify them in the photographs he was shown.

Although Aqua's evidence in regard to the loss of third category of equipment is somewhat weaker than its evidence in regard to the second category, the Court finds that it suffices, albeit somewhat narrowly, to create a fact question on the issue. Reading this testimony in the light most favorable to Aqua, a reasonable jury could choose to credit Wathen's testimony that the mini cam and Titan crawler were used at the worksite at some point during the week before it was taken, and thus were on the truck at that time. The jury could further believe Robinson and Llewellyn that these pieces of equipment were ordinarily, if not always, stored on the truck. The jury could also choose to believe Rodriguez and Llewellyn that the Titan crawler has not been seen since the day of the theft, and to believe Llewellyn (and not Rodriguez) that the mini cam was also missing from the equipment yard after the theft. Based on this evidence, a reasonable jury could infer that both the camera and the crawler must have been on the van during its theft and incineration, perhaps because they had been used at the jobsite during that day's work. This would of course require disbelieving the testimony of Rosencrants, Weippert, and Herndon, which, as explained above, a reasonable jury could also do.[7]

Accordingly, since there remain questions of fact as to whether each piece of claimed equipment was in fact lost, the Court is unable to grant summary judgment on these issues.

C.  Overstatement of the Value of the Lost Equipment?

The insurers' second argument in favor of the false-swearing defense is that, even if all the equipment claimed by Aqua was actually stolen, Aqua wrongfully overstated the equipment's value in its sworn statements in proof of loss. In support of this argument, the

---

[7] It would not necessarily require discrediting Rodriguez's testimony that neither piece of equipment was on the truck the night *before* it was stolen -- although Rodriguez testified that he had not noticed it being replaced the next morning, that does not mean it could not have been.

insurers note that, as observed above, the original sworn statements valued the lost equipment at approximately $230,000, when in fact Aqua paid only about $197,000 for it.

In response, Aqua points to the evidence explained above, indicating that the original purchase price for the equipment was closer to $250,000 -- a greater amount than it has ever claimed -- and that its revised statement in proof of loss reflects the lower $197,000 purchase price.  Aqua's explanation for the discrepancy between the initial purchase price and amounts claimed, on the one hand, and the final price and final amount claimed, on the other, is that it had not yet paid Doheny for the van and equipment at the time of the theft, and that after Aqua filed its initial statements in proof of the loss, negotiations with Doheny reduced the quoted price to the $197,000 that was actually paid, and that appears on Aqua's later sworn statement filed with Federal.

The Court agrees that questions of fact remain as to this matter.  Although the quote and purchase order prices, the sworn statements of loss, and the final sale price are all in the record, there does not appear to be any evidence as to the date that the final $197,000 payment was made, and thus it is impossible to conclude with certainty that Aqua's story is plausible.  But this lack of detail also means that a reasonable jury would not be compelled to accept the insurers' claims of fraud, either.  Therefore, summary judgment is not appropriate on this issue.

D.  Overstatement of Rental Expenses?

The final argument in regard to the false-swearing defense is advanced only by West American.  This argument is that Aqua exaggerated the time period after the theft for which it needed to rent a replacement van and equipment, and therefore also misrepresented the rental costs it incurred.  In its January 2007 sworn statement in proof of loss to West American, Aqua claimed reimbursement for "Truck rental for 5 weeks 11/7/2006 to

12/12/2006," in the amount of $25,000.  West American, however, points to evidence that Aqua was able to purchase a new truck and equipment package, identical to the old one, from Doheny by November 17th, 2006, and claims that the new truck was in service by a few days later, at the latest.[8]  Dep. of Douglas Allan-Edward Kamienecki, docket no. 43-6, p. 20.  Based on this evidence, West American asserts that Aqua overstated the time truck rental was necessary by at least three weeks.  Based on the 5-week claim of $25,000, West American apparently calculates the weekly rental at $5000, and therefore asserts a misrepresentation of the claim's value in the amount of $15,000.

In response, Aqua notes that there is evidence in the record that it was planning to buy a second truck even before the loss of the first.  Angelo D'Alessandro, 70% owner of Aqua Group and the one who provided the financing to buy the first truck, stated that Aqua had already arranged with Doheny to buy the second truck when the first one was burnt.  Dep. of Angelo D'Alessandro, docket no. 33-11, pp. 37-38, 66.  Gary Mapes, Aqua's liaison at Doheny, also appeared to indicate that he was negotiating multiple truck purchases with Aqua simultaneously during October of 2006.  Dep. of Gary Mapes, docket no. 33-8, pp. 8-9.  Although other witnesses consistently refer to the truck purchased from Doheny on November 17th as a "replacement truck," none of them offer any more concrete contradiction of this testimony.  It thus appears that a reasonable jury could conclude that the "replacement" moniker became attached to the second truck only after the loss of the first, and that if the loss had not occurred Aqua would have purchased the second truck anyway, not as a "replacement" but instead as an expansion of its business.  Of course,

---

[8]  West American provides no evidentiary support for this in-service date, which would itself be grounds for denying summary judgment.  As Aqua does not advance this argument, however, the following assumes that the new van was indeed in service starting around November 21st.

if Aqua had decided to buy the second truck for this purpose, then the real "replacement" for the first truck was in fact the rental truck. Accordingly, the Court is unable to grant summary judgment in favor of West American on this basis.

E.  Conclusion -- False Swearing Defense

For the foregoing reasons, the Court finds that questions of fact remain as to whether each item of equipment purchased with the truck was present on it when the fire occurred, whether Aqua represented the value of its equipment loss as $230,000 even after it had successfully re-negotiated a price of under $200,000, and whether Aqua overstated the period (and thus the cost) of its replacement rental. As a result, the Court is unable to grant summary judgment on the insurers' false-swearing defenses.

Additionally, even if the Court were to regard the evidence as conclusively establishing the falsity of some of Aqua's claims, summary judgment as to false swearing still might not be appropriate. This is because, even if some of Aqua's claims were untrue, there is precious little evidence in the record to indicate that they were intentionally or recklessly so. The insurers argue that because Aqua's own employees testified that some of the equipment was not present on the truck shortly before the theft, Aqua should have known that a representation to the contrary would be false. But as has been discussed, the recollections of Aqua employees conflict sharply as to what equipment was on the truck. Clinton Llewellyn, the Aqua member who actually swore to one of the statements in proof of loss, has stated by affidavit that he has not seen any of the equipment package since the day of the theft. Given this evidence, even if those statements were indeed false, on this record a reasonable jury could conclude that they were not intentionally or recklessly false.

23

It might be more difficult for a jury to reach a similar conclusion in regard to the allegedly exaggerated claimed values of the equipment and of the rental replacement truck. If Aqua had in fact negotiated a lower sale price before filing its statements in proof of loss, or if it in fact purchased the second truck to replace the first and not to expand its business, it seems unlikely that it could have misrepresented these facts in an innocent fashion. Since the predicate falsity of the statements in proof of loss has not been established, however, the Court deems it unwise to consider summary judgment on this issue, which is seemingly more remote, at this time.

Accordingly, with respect to the insurers' defenses of false swearing, the Court will deny the motions for summary judgment.

III.  Was the Employee-Dishonesty Coverage Cancelled as to Rosencrants?

The West American policy held by Aqua also included an "Employee Dishonesty Coverage Form," which provided coverage for losses caused by employee dishonesty. West American does not appear to dispute that Rosencrants was an "employee" or that his acts were "dishonest," within the meaning of the policy.  Instead, it maintains that the employee-dishonesty coverage was cancelled as to Rosencrants pursuant to a provision in the Employee Dishonesty Coverage Form stating that "[t]his insurance is cancelled as to any 'employee:' a.  Immediately upon discovery by (1) You, or (2) Any of your partners, officers, or directors not in collusion with the 'employee:' of any dishonest act committed by that 'employee' whether before or after becoming employed by you."  Docket no. 29-5, p. 28.  There is no dispute between the parties that Rosencrants had a criminal history at the time he applied to work for DCG; West American maintains that some person or persons qualifying as "You" within the meaning of the policy had discovered this before the date of the theft.  Aqua disputes this.

24

A. Facts

It is clear that at least DCG was provided with some information as to Rosencrants's criminal history.  His employment application, filed with DCG, has been adduced in evidence.  *See* docket no. 30.  The application includes the question, "Have you been convicted of a crime?," next to which Rosencrants checked a box marked "Yes."  *Id.* at 4.  The next line inquired "If so, where, when and nature of offense."  Rosencrants's only response to this question was to write "5 yrs."  *Id.*  Although Rosencrants testified that this represented time on probation rather than imprisonment, dep. of James Jay Rosencrants, docket no. 30-3, p. 91, nothing on the application suggested as much.

Rosencrants testified, however, that he had made his DCG supervisor David Letz aware of his criminal history in more detail, apparently through verbal conversation. According to Rosencrants, "I told [Letz] I was going through a divorce and I had some hard times and took my kids without permission," *id.* at 92, leading to his conviction of custodial kidnaping and a sentence of 5 years' probation, which DCG was also aware of, *id.* at 91. Rosencrants did not know whether D'Alessandro himself knew he had a criminal history, *id.* at 91, and D'Alessandro stated that he never saw Rosencrants's employment application and knew of no such history, aff. of Angelo D'Alessandro, docket no. 33-14, ¶¶ 1-2; dep. of Angelo D'Alessandro, docket no. 34-4, pp. 10-11, 13-14.  Rosencrants was certain, however, that Letz and Clinton Llewellyn were aware that he had committed a crime, because he had to get permission from them to leave work for appointments with his "parole officer."  *Id.* at 91, 95, 97.

Llewellyn disagrees with this, stating that he had a 20-year-long professional relationship with Rosencrants, Exam'n Under Oath of Clinton Llewellyn, docket no. 33-13, pp. 21, 31, and that despite knowing him "very well" in that capacity, *id.* at 31,  "I knew of

no criminal activity by Mr. Rosencrants ever.  As far as I knew, he was a good clean cut employee . . ."  *Id.* at 33.  Llewellyn further stated that he never saw Rosencrants' employment application.  *Id.* at 31.  Carlos Rodriguez, on the other hand, testified that he "did know that [Rosencrants] went to prison for some time.  I didn't ask him for what, it's not my business.  He just told me he did some time, and that was it."  Dep. of Ynderso Carlos Rodriguez, docket no. 30-2, p. 128.  There does not appear to be any record testimony from David Letz on the question of his knowledge of Rosencrants's past.

B.  Analysis

This evidence raises two significant questions as to the applicability of the "discovery" cancellation provision.  The first question is whether anyone at DCG or Aqua had sufficient knowledge of Rosencrants's past to qualify has having "discover[ed]" a prior dishonest act by him.  The second question is whether any such persons or persons were high enough up in the structures of Aqua Group and DCG for their discovery to trigger the cancellation.

1.  Did "Discovery" Occur?

Based on the testimony of Llewellyn and D'Alessandro, questions of fact remain as to whether they knew that Rosencrants had ever committed a crime.  By contrast, the uncontradicted record evidence is that Rodriguez was aware that Rosencrants had been in jail, and that Letz knew that he had been convicted of custodial kidnaping.  In the Court's view, mere knowledge that a person has been in prison does not amount to a "discovery" of a dishonest act by that person -- not all crimes are acts of dishonesty; some are acts of pure violence, and others are simply acts of gross irresponsibility.  Thus, Rodriguez's

26

knowledge of Rosencrants's prison time would have been insufficient to cancel the policy as to Rosencrants.[9]

Letz, on the other hand, apparently knew not only that Rosencrants had committed a crime, but also that the crime was custodial kidnaping.  West American cites *F.L. Jursik Co. v. Travelers Indemnity Ins. Co.*, docket no. 199913, 1997 WL 33332724, *1 (Mich. App. Nov. 14th, 1997), for the proposition that larceny is a dishonest act, and argues that the taking of a child without his or her legal guardian's consent should be treated similarly.  The Court agrees with the argument, but finds it unnecessary to reach a final conclusion on the matter.  This is because, even if custodial kidnaping is in fact an act of dishonesty, the Court will conclude that as a matter of law, Letz's position in DCG was not such that his discovery of a dishonest act by Rosencrants would trigger the cancellation clause.

    2.  Was the Discovery Imputable to DCG?

As noted, the West American Employee Dishonesty Coverage Form provides that "[t]his insurance is cancelled as to any 'employee:' a.  Immediately upon discovery by (1) You, or (2) Any of your partners, officers, or directors not in collusion with the 'employee:' of any dishonest act committed by that 'employee' whether before or after becoming employed by you."  Docket no. 29-5, p. 28.  As a limited liability company, of course, DCG had neither partners nor directors, nor is there any evidence in the record as to whether it

---

[9] At the hearing on this matter Aqua Group also suggested that discovery that a person had actually been convicted of a crime of dishonesty should not be regarded as identical to a discovery that the person had actually committed the dishonest act, on the theory that some defendants are convicted of crimes they did not commit.  The Court will not accept this kind of casual second-guessing of criminal convictions.  It is possible that Aqua's proposed distinction would have merit in a situation where there was an indication that the conviction might have been inaccurate, such as employee's assertion that he was innocent of the crime.  But that was not the case here.  In fact, Rosencrants testified that he *admitted* to David Letz that he (Rosencrants) "took my kids without permission."  Dep. of James Jay Rosencrants, docket no. 30-3, p. 92.

had "officers," or who they might have been.  The question thus becomes whether any person or entity referred to as "You" by the policy had knowledge of a prior dishonest act by Rosencrants. Although the Employee Dishonesty Coverage Form does not itself define the word "you," other sections of the policy shed light on the matter by stating that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  Docket no. 29-3, pp. 9, 32; docket no. 29-4, *passim*, docket no. 29-5, p. 32.

There is no dispute that both DCG and Aqua themselves are Named Insureds.[10]  In support of its contention that Letz (as well as Rodriguez) also have this status, West American points to Section II of the Commercial General Liability Coverage Form, which is referred to by various other portions of the policy.  This section is entitled "Who Is An Insured." Docket no. 29-3, p. 17.   It provides that "[i]f you are designated in the Declarations as: . . . .  A limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers." *Id.*  West American contends that Letz qualifies as a "manager" of DCG (and that Rodriguez is a "manager" of Aqua)  within the meaning of this section, and therefore is a "Named Insured" whose discovery of Rosencrants's custodial kidnaping would cancel the employee dishonesty coverage.

---

[10]  The parties have not addressed the additional question of whether the discovery of a dishonest act by only one of multiple Named Insureds would suffice to cancel the relevant coverage.  Since the policy defines "you" as "*the* Named Insured . . . *and* any other person or organization qualifying as a Named Insured," it is at least plausible that *all* Named Insureds would have to satisfy such a condition before "you"could be said to have done so. If this were the case, even DCG had discovered a prior dishonest act by Rosencrants, that alone would not cancel the employee dishonesty coverage as to him.  As West American has offered no argument on the topic, however, and as the Court will deny summary judgment on other grounds, the issue need not be dealt with here.

There are two major problems with this reading of the policy language.  First, the "Who Is An Insured" section specifies that managers of LLCs are "insureds."  But the oft-recurring section defining the word "you"-- the relevant word in the cancellation provision -- iprovides that the term includes only "Named Insureds."  From the rest of the policy, it appears that "Named Insureds" is a separate category from mere "insureds."  The phrase "Named Insureds" appears at several other places throughout the policy, and each time appears to refer only to the insureds actually listed in the Declarations, as opposed to any other persons who qualify as "insureds" under the "Who Is An Insured" section. Docket no. 29-3, pp. 35-37, 42; docket no. 29-5, pp. 4, 33, 36, 41, 52, 60, 68, 78.  Indeed, that section itself, in a provision located on the same column of the same page as the provision defining who qualifies as "insureds" for an LLC, also specifies ways in which other organizations can qualify as "Named Insureds."  *See* docket no. 29-3, p. 33; *see also id.* p. 46 (deleting and replacing the definition in question); docket no. 29-5, pp. 72-73 (same).  In this light, the Court concludes that the word "you," as defined in the policy, does not include the managers of an LLC listed in the declarations, and thus that the discovery of an employee's dishonest acts by such a manager does not in itself cancel the employee-dishonesty coverage as to that employee.[11]

Second, even were this not the case, the Court would additionally conclude that neither Letz nor Rodriguez is in fact a "manager" of DCG or Aqua, within the meaning of the policy.  In Michigan, the powers and duties of managers of LLCs, as well as the procedures for selecting them, are defined by statute.  *See* Mich. Comp. L. §§ 450.4401

---

[11]  The parties have not explicitly addressed the question of what circumstances would be required for a Named Insured itself to have "discover[ed]" an employee's dishonest acts, when the Named Insured is not a natural person.  Accordingly, and in light of its following conclusion that the evidence does not demonstrate that Letz was even a manager of DCG under Michigan law, the Court expresses no view on the matter.

to 4408.  Specifically, "[a] vote of a majority in interest of the members entitled to vote in accordance with section 502(1) is required to select managers to fill initial positions or vacancies.  Mich. Comp. L. § 450.4403.  Thus, as D'Alessandro held a majority interest in both DCG and Aqua Group, no managers for either organization could be selected without his consent.  D'Alessandro has unequivocally stated that neither Rodriguez nor Letz (nor Rosencrants, for that matter) have ever been managers of either entity.  Aff. of Angelo D'Alessandro, docket no. 33-14, ¶ 3.[12]

In the face of this evidence, West American appears to argue that whether a person is a "manager" within the meaning of the policy should be determined by the function that person plays within the LLC organization, rather than with reference to his or her status under the statutory scheme.  It is true that Letz and Rodriguez held relatively senior posts in DCG and Aqua, respectively, and probably discharged duties there that, if considered outside the context of Michigan's LLC statutes, could be described as "managerial." Nevertheless, both Michigan's canons of contractual interpretation and the language of the policy itself compel a contrary interpretation of the word "managers," as it appears in the policy.

The Michigan Supreme Court has said that when a "legal phrase of art" in a contract, it should "be interpreted in accord with common law understandings and case law explanations that those familiar with such terms of art are held to understand." *Henderson v. State Farm Fire & Casualty Co.*, 460 Mich. 348, 357 n.9 (1999).  Citing *Henderson*, the Sixth Circuit has noted that "[t]he Michigan Supreme Court employees dictionary definitions to interpret nontechnical terms but uses specialized dictionaries and caselaw to interpret

---

[12]  West American asserts that this statement is inadmissible because it was not made on personal knowledge.  Since as a matter of Michigan law no managers could be appointed without D'Alessandro's action, this argument fails.

legal terms of art." *Minges Creek, LLC v. Royal Ins. Co*, 442 F. 3d 953, 956 (6th Cir. 2006). In light of the distinctive legal definition that Michigan law assigns to the word "managers," when used to refer to employees of limited liability companies, the Court is well satisfied that it is a term of art in that context.  Accordingly, the provisions of the West American policy that refer to the "managers" of limited liability companies must be interpreted according to the legal meaning of the word, and not according to some more colloquial definition.  As noted above, there is no evidence that either Letz's or Rodriguez's status fell within the legal category of "manager."

Even if this canon did not apply, the context provided by the language of adjacent provisions of the policy would amply indicate that the word "managers," as used in the policy, bears its formal legal definition.  As noted, one portion of the "Who Is An Insured" section provides that "managers" of LLCs are insureds.  Docket no. 29-3, p. 33.  The paragraph that immediately precedes this one provides that when the party listed in the declarations is a partnership, its partners and their spouses are also "insureds."  *Id.*  The paragraph dealing with LLCs provides that their "members" are also insureds.  *Id.*  And the immediately following paragraph states that, for "[a]n organization other than a partnership, joint venture or limited liability company," the insureds are the organizations executive officers, directors, and stockholders. *Id.*  Each of these words denotes a well-defined legal status within an organization.  As the word "manager" can also be interpreted to refer to such a status, it would be unacceptably incongruous for the Court instead to adopt a more open-ended meaning.[13]

---

[13] These provisions also offer another reason for the conclusion reached above, that the class of "insureds" must be regarded as distinct from the class of "Named Insureds," and that only a Named Insured's discovery of an employee's prior dishonest actions can cancel the coverage.  As noted, the policy provides for cancellation upon discovery of a dishonest act by "(1) You, or (2) Any of your partners, officers, or directors . . ."  But since under these

**CONCLUSION AND ORDER**

West American asserts that the loss claimed by Aqua falls within a coverage exclusion in its policy for losses caused by the dishonesty of the insured's employees. While there may be some merit to this contention, the portions of the policy quoted and relied upon by West American do not appear in the record, and the Court is therefore unable to grant summary judgment on this issue.

Questions of fact remain as to whether Aqua submitted accurate information to West American and Federal in regard to (1) what equipment was on the truck at the time it was stolen, (2) how much Aqua had paid or agreed to pay for that equipment, and (3) whether a portion of Aqua's rental expenses was incurred after Aqua had already purchased another truck to replace the lost one. Even if Aqua misrepresented what equipment was on the truck, questions of fact would remain as to whether it did so intentionally or recklessly. Accordingly, summary judgment is not appropriate on the insurers' false-swearing defenses.

Finally, West American's argument that the policy had been cancelled due to the discovery of Rosencrants's past dishonest acts is also without merit. Fact questions remain as to whether D'Alessandro, Llewellyn or Rodriguez had even made such a discovery at all. Although Letz had indeed learned of Rosencrants's custodial kidnaping, it is clear that under the policy language Letz's status within the DCG organization was not sufficient for his discovery to effect the cancellation claimed by West American.

---

provisions the term "insured" *already* includes the partners in a partnership, or the officers and directors of a corporation, if the term "you" encompassed mere "insureds," then it would be largely superfluous to additionally list "your partners, officers, or directors" as persons whose discoveries of dishonesty could cancel the policy. While some confusion of this sort may be inevitable in a complex document such as this one, the Court's presumption is that a different meaning was intended. As discussed above, the other indicators reinforce that presumption here.

32

**WHEREFORE**, it is hereby **ORDERED** that plaintiff's motion for leave to file a sur-

response is **GRANTED**, and defendants' motion for summary judgment is **DENIED**.


**SO ORDERED.**


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: May 15, 2009

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on May 15, 2009, by electronic and/or ordinary mail.

Alissa Greer
Case Manager